## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

NICHOLAUS JOHNSON and
JENNIFER JOHNSON,

Civil No. 10-684 (JRT/LIB)

Plaintiffs,

v.

UNIVERSAL ACCEPTANCE
CORPORATION *(MN)*; MINNESOTA
REPOSSESSORS, INC.; JOHN DOE
*repossessor 1*; JOHN DOE *repossessor 2*;
JOHN DOE *repossessor 3*; OFFICER
JAMES TOWNLEY; OFFICER RYAN
NELSON; OFFICER ERIC HIETALA;
OFFICER JEREMIAH NUTZHORN; and
THE CITY OF HIBBING,

Defendants.

**MEMORANDUM OPINION AND
ORDER GRANTING SUMMARY
JUDGMENT TO THE HIBBING
DEFENDANTS**

---

Nicholas P. Slade, **BARRY & SLADE, LLC**, 2021 East Hennepin Avenue, Suite 195, Minneapolis, MN 55413, for plaintiffs.

Scott P. Drawe, **DRAWE & MALAND**, 7650 Edinborough Way, Suite 640, Edina, MN 55435, for defendant Universal Acceptance Corporation.

Patrick H. Elliott, **ELLIOTT LAW OFFICES, PA**, 2409 West Sixty-Sixth Street, Minneapolis, MN 55423, for defendant Minnesota Repossessors, Inc.

Jason M. Hively, Jon K. Iverson, and Stephanie A. Angolkar, **IVERSON REUVERS, LLC**, 9321 Ensign Avenue South, Bloomington, MN 55438, for defendants Officer James Townley, Officer Ryan Nelson, Officer Eric Hietala, Officer Jeremiah Nutzhorn, and the City of Hibbing.

This case arises out of the repossession of a vehicle owned by plaintiffs Nicholaus

Johnson and Jennifer Johnson ("the Johnsons").  They have sued not only the companies

involved in the repossession, but also several police officers who performed a civil standby during the repossession, as well as the officers' employer, the City of Hibbing itself ("the City" and, collectively with the officers, "the Hibbing defendants").  The Johnsons assert, among other claims, that the officers' alleged intervention on behalf of and assistance to the repossessors constituted a deprivation of due process and illegal seizure in violation of the Fourteenth and Fourth Amendments.  The Hibbing defendants have moved for summary judgment, arguing that the officers involved in the incident are entitled to qualified immunity and official immunity for their conduct in the course of a civil standby on a public street during which the Johnsons were belligerent, and that the Johnsons have not stated any viable claim against Officer Jeremiah Nutzhorn or the City. The Court agrees, and grants summary judgment to the Hibbing defendants.

## BACKGROUND

On or about March 21, 2009, the Johnsons acquired a 1999 Ford Expedition. (Dep. of Nicholaus Johnson at 17, Sept. 27, 2010, Ex. A, Docket No. 24.)  Their purchase was financed by defendant Universal Acceptance Corporation ("UAC"), which acquired a security interest in the vehicle.  (Compl. ¶ 15, Docket No. 1.)  The Johnsons previously had three other vehicles repossessed.  (N. Johnson Dep. at 19-20, 23.)  Within months of purchasing the Expedition, they fell behind on their payments.  (*Id.* at 25.)  By December 2009, however, Mr. Johnson believed they "had worked it out" with UAC and established a verbal agreement with a UAC supervisor, which included several immediate payments and an agreement to commence monthly payments to UAC.  (*Id.* at 26; Compl. ¶ 25-26.)

On January 18, 2010, Thomas and Patrick Lesemann of Minnesota Repossessors, Inc. approached Hibbing Police Officer James Townley while he was parked in his patrol car monitoring traffic.  (Dep. of James Townley, Sept. 28, 2010, at 10, Ex. C, Docket No. 24.)  The Lesemanns showed Townley a repossession request from UAC and asked him to standby while they repossessed the Johnsons' Expedition.  (*Id.*)  Townley advised the Lesemanns that "this is a civil matter and I really don't care to get involved[,]" but he agreed to sit in his vehicle and standby to keep the peace.  (*Id.* at 10-11.)  Townley observed one of the Lesemanns approach the Johnsons' door, and then saw Mr. Johnson emerge from his home "really angry and upset and yelling."  (*Id.* at 11.)   Determining that he "might have to diffuse" the situation, Townley exited his vehicle, walked up to the individuals, and asked Mr. Johnson to calm down.  (*Id.* at 13-14.)  Mr. Johnson informed Townley: "If you weren't here, these [repossession] guys would be on the ground."  (*Id.* at 15.)  At that point, Townley requested backup.  (*Id.*)

Shortly before additional officers responded, a tow truck arrived and began backing up to the vehicle, which was parked on the street.  (*Id.* at 17.)  Mr. Johnson stood between the tow truck and the Expedition to prevent the tow truck from hitching up to the vehicle.  (N. Johnson Dep. at 42.)   Eric Hietala, one of the officers responding to Townley's request, observed "[e]veryone . . . close together and yelling loudly."  (Aff. of Nicholas Slade, Dec. 29, 2010, Ex. B at 1, Docket No. 26.)  Hietala "instructed a male later identified as [a representative] from Repossessions Inc. to stand on the curb. [Hietala] positioned [him]self behind [Mr. Johnson] because **he was yelling, cursing and flailing his hands the most and loudest**."  (*Id.* (emphasis added).)  Hietala believed that

Mr. Johnson "was most likely to cause potential problems." (*Id.*) When Ms. Johnson began yelling at one of the repossession agents, Hietala separated the two. (Dep. of Eric Hietala, Sept. 28, 2010, at 14, Ex. D, Docket No. 24.)

Ryan Nelson, another responding officer, observed Mr. Johnson yelling, swearing, and hysterically pleading over the phone in an attempt to avoid repossession of the vehicle. (Dep. of Ryan Nelson at 14-15, Sept. 28, 2010, Ex. E, Docket No. 24.) Nelson also observed Ms. Johnson yelling at the police, demanding that the repossession agents leave her property. (*Id.* at 16.) Nelson advised Ms. Johnson that they were on a public street, along with the vehicle, and that he had no authority to stop the repossession. (*Id.* at 25.) While Nelson did not advise the repossession agents to leave, he did inform them that "there is nothing we could do to enforce [the repossession]" and he claims he may have suggested that they "try again a different day." (*Id.* at 25.) Nelson explained that he "was trying to make suggestions to both sides . . . of the equation here." (*Id.* at 26.)

At some point, Mr. Johnson removed his property from the vehicle, and then entered the car while it was hitched, claiming the repossession agents could not take the vehicle while he was sitting inside of it. (*Id.* at 17; Townley Dep. at 28-29; N. Johnson Dep. at 47-48.) As Mr. Johnson explained, "I was extremely angry. I was extremely frustrated. . . .  I explained my disgust for [the repossession agents], as well as what UAC was doing right now. . . . I know expletives were used. . . . I know that I verbally abused . . . [j]ust about everybody that was there [including the officers]." (N. Johnson Dep. at 47-49.) Nelson warned Mr. Johnson to calm down or risk arrest for disorderly conduct. (Nelson Dep. at 19.) According to Nelson, Mr. Johnson stated, "I am going to

get in the truck and I'm going to run those fuckers over." (*Id.* at 22.) Nelson elaborated

on the events that followed:

> [H]e came towards me.  And he actually tried to go past me, almost kind of pushing me as he was going by me to get into the vehicle.  That's when I placed my hand on his chest and I said: Stop Nick.  You are getting very close to getting arrested now for a more serious crime, which was terroristic threats.  And he just turned around and walked away.  So he stopped his movement towards me at that point.

(*Id.*)  Hietala likewise believed he had probable cause to arrest Mr. Johnson based on his

conduct; however, he intended to allow the Johnsons to vent their frustrations "[a]s long

as they didn't get physical with anybody with regards to anything." (Hietala Dep. at 31.)

Ultimately, Mr. Johnson gave the repossession agents the keys to the vehicle

"because [he] didn't want them towing it[,]" a process the Johnsons believed might

damage the vehicle.  (N. Johnson Dep. at 57-58.)  The agents drove the Expedition away.

(*Id.*)  Approximately one week after the repossession, the vehicle was returned to the

Johnsons undamaged.  (*Id.* at 60-61, 63.)  The Johnsons' damages resulting from their

need to obtain a rental vehicle in the interim period are approximately $400.  (*Id.* at 61-

63.)  The Johnsons have not sought treatment for any emotional distress arising from this

incident.  (Dep. of Jennifer Johnson at 44, Sept. 27, 2010, Ex. B, Docket No. 24.)

The Johnsons filed suit against the repossession agents and companies involved in

the repossession as well as the Hibbing defendants.  They allege that the police officers

intervened in and inappropriately facilitated the repossession in violation of their

constitutional rights.  The Hibbing defendants move for summary judgment, asking the

Court to dismiss all claims against them on the ground of qualified immunity and, in the cases of Officer Jeremiah Nutzhorn and the City, failure to state a viable claim.

## ANALYSIS

## I.     STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.    CLAIMS AGAINST TOWNLEY, NELSON, AND HIETALA: QUALIFIED IMMUNITY

The Hibbing defendants argue that Townley, Nelson, and Hietala – the three responding police officers – are entitled to summary judgment on the Johnsons' constitutional claims on the ground of qualified immunity. "Qualified immunity shields government officials from suit unless their conduct violated a clearly established constitutional or statutory right of which a reasonable person would have known."

*Yowell v. Combs*, 89 F.3d 542, 544 (8th Cir. 1996) (footnote omitted).  In considering an assertion of qualified immunity, the Court considers two questions:

> (1) whether, after viewing the facts in the light most favorable to the party asserting the injury, there was a deprivation of a constitutional right; and, if so, (2) whether the right was clearly established at the time of the deprivation such that a reasonable official would understand his conduct was unlawful in the situation he confronted.

*Vaughn v. Greene Cnty., Ark.*, 438 F.3d 845, 850 (8th Cir. 2006).  "Qualified immunity is appropriate only if no reasonable factfinder could answer yes to both of these questions." *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 528 (8th Cir. 2009).  Courts may exercise discretion in determining the sequence in which it addresses these two questions. *Pearson v. Callahan*, 555 U.S. 223, ---, 129 S. Ct. 808, 818 (2009).  The Court finds it appropriate to consider first whether a reasonable factfinder could determine that the officers' actions deprived the Johnsons of a constitutional right.

## A.    Constitutional Violation

The Johnsons assert that the officers violated their rights under the Fourth and Fourteenth Amendments.   The Fourth Amendment protects individuals from "unreasonable searches and seizures . . . ."  U.S. Const. amend. IV.   Through the Fourteenth Amendment, the Fourth Amendment is applicable to action by state actors. *See Mapp v. Ohio*, 367 U.S. 643, 655 (1961).  The Fourteenth Amendment also provides that a state may not "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.   "A seizure [for purposes of the Fourth Amendment] occurs when 'there is some meaningful interference with an individual's possessory

interests' in the property seized." *Maryland v. Macon*, 472 U.S. 463, 469 (1985) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).   The Ninth Circuit has concluded that in the context of an accusation that law enforcement officers unlawfully facilitated a private repossession, the Fourth and Fourteenth Amendment inquiries are essentially the same. *Meyers v. Redwood City*, 400 F.3d 765, 770-71 (9th Cir. 2005).  The Court agrees, and will analyze the claims together.

Neither the Fourth nor Fourteenth Amendment protects against the conduct of private persons such as the repossession agents in this case. *Moore v. Carpenter*, 404 F.3d 1043, 1046 (8th Cir. 2005).  Rather, "states are held responsible for private conduct only when the state has exercised coercion or significantly encouraged the conduct, not when the state has merely acquiesced in a private party's initiatives." *Id.*  Accordingly,

> [w]hen a police officer is involved in a private party's repossession of property, there is no state action if the officer merely keeps the peace, but there is state action if the officer affirmatively intervenes to aid the repossessor enough that the repossession would not have occurred without the officer's help.

*Id.*; *see also Jones v. Gutschenritter*, 909 F.2d 1208, 1212 (8th Cir. 1990) ("While mere acquiescence by the police to stand by in case of trouble is insufficient to convert a repossession into state action, police intervention and aid in the repossession does constitute state action." (internal quotation marks omitted)).  The Court must consider the totality of the circumstances in deciding whether the officers were "so involved in aiding the repossession that the deprivation of the [vehicle] is state action." *Moore*, 404 F.3d at 1046.

Even viewing the facts in the light most favorable to the Johnsons, the Court concludes that no reasonable factfinder could find that the officers' behavior with regard to the repossession rose to the level of state action. The Johnsons argue that the officers "intimidate[d] Mr. Johnson into not exercising his right to resist the repossession by threatening to arrest him whenever he became too aggressive in his resistance, all [the] while ignoring his clear objections" and "unreasonably recogniz[ing] the repossessors['] repossession order over the Johnsons' insistence that they were current under their agreement with the bank . . . ." (Pl.'s Response at 16, Docket No. 25.) The record evidence, however, is to the contrary. Townley agreed to perform a civil standby, and requested backup only after Mr. Johnson threatened: "If you weren't here, these [repossession] guys would be on the ground." (Townley Dep. at 15.) Nelson attempted "to make suggestions to both sides" and informed the repossession agents that "there is nothing we could do to enforce [the repossession]" and that they might "try again a different day." (Nelson Dep. at 25-26.) When Ms. Johnson began yelling at one of the repossession agents, Hietala simply separated the two. (Hietala Dep. at 14.) Both Hietala and Nelson believed they had probable cause to arrest Mr. Johnson based on his conduct, but decided to allow him to vent his frustrations as long as he did not engage in any physical violence. These actions – none of which are disputed by the Johnsons – defeat a finding of coercion or affirmative intervention; rather, they reflect reasonable efforts at keeping the peace.

Far from proffering evidence to undermine the officers' accounts of the civil standby, the Johnsons admit that Mr. Johnson was verbally abusive to everyone in the

vicinity, including the police officers.  For example, Mr. Johnson has not denied stating: "I am going to get in the truck and I'm going to run those fuckers over."  The Johnsons nonetheless argue that the police officers unlawfully encouraged and facilitated the repossession **by not forcing the repossession agents to leave** in the face of their rigorous protests.  It is far from clear, however, that the agents' actions were illegal.

Under Minnesota law, a secured creditor may engage in self-help efforts to repossess collateral upon default as long as such efforts do not result in a breach of the peace.  Minn. Stat. § 336.9-609(b)(2).  While the Minnesota Supreme Court has not addressed the issue of whether an oral protest such as the Johnsons' constitutes a breach of the peace preventing repossession agents from continuing a repossession, they apply a two-part test to "'determin[e] whether a breach of the peace has occurred during a repossession of collateral: (1) whether there was entry by the creditor upon debtor's premises, and (2) whether the debtor or one acting in his behalf consented to the entry and repossession.'"  *James v. Ford Motor Credit Co.*, 842 F. Supp. 1202, 1208 (D. Minn. 1994) (alteration in original) (quoting *Bloomquist v. First Nat'l Bank of Elk River*, 378 N.W.2d 81, 84 (Minn. Ct. App. 1985)).  The court in *James* concluded that the limitations on self-help repossession articulated in *Bloomquist* apply only "to those attempts at self-help repossession where the creditor enters the debtor's private residence or business property in the face of the revocation of consent to repossession."  *Id.* at 1209.  The court determined that under Minnesota law, creditors are entitled to self-help repossession **on a public street** despite debtors' protests.  *Id.*; *see also Clarin v. Minn. Repossessors, Inc.*, 198 F.3d 661, 664 (8th Cir. 1999) ("As a repossession moves farther from the debtor's

residence, the argument for a breach of the peace becomes more tenuous."). Here, while the Johnsons made their objection to the repossession abundantly clear, the repossession agents were repossessing the vehicle from a public street, not from the Johnsons' private property.

It is unnecessary for the Court to determine whether the agents' repossession was lawful to dispose of the instant motion, however. Given the Johnsons' failure to cite any precedent for the proposition that a repossession in a public street over the debtors' protests violates Minnesota law, the police officers cannot be liable for facilitating the repossession simply because they did not compel the repossession agents to leave. As Townley stated in his deposition, in response to a question about why he did not order the agents to leave:

> It wasn't my place . . . . That would have been just like telling the Johnsons that they had to give their vehicle back to the repossession people. It wasn't my place. My only job there is to make sure that things go civilly and that the laws aren't broken and nobody gets hurt. I don't have the right to tell the Johnsons to give the vehicle back to the repossession people, and I don't have the repossession people, the right to tell them to leave. That they can't take the vehicle.

(Townley Dep. at 26.)

The Johnsons cite *Marcus v. McCollum*, 394 F.3d 813 (10th Cir. 2004), in which the Tenth Circuit concluded that police officers' actions during a self-help repossession in Oklahoma amounted to inappropriate interference. The court recognized, however, that "officers may act to diffuse a volatile situation . . . ." *Id.* at 819. The officers in this case were confronted with a volatile situation involving yelling and threats of serious violence. Unlike *Marcus*, in which there was evidence that "the officers repeatedly told [the

debtors] to allow [the creditor] to take possession of the automobile and threatened them with arrest if they continued to resist[,]" *id.* at 821, here the officers threatened arrest only after Mr. Johnson made terroristic threats and only **after the vehicle was already hooked up to the tow truck and in the repossession agents' control**.  At that point, the repossession was completed.  *See James*, 842 F. Supp. at 1209 ("Once a repossession agent has gained sufficient dominion over collateral to control it, the repossession has been completed.").  Moreover, the vehicle in *Marcus* was not parked on a public street as was the Johnsons' car.  *See Marcus*, 394 F.3d at 821.  As Mr. Johnson himself acknowledged in his deposition, based on his own prior personal experiences with vehicle repossession, he understood that if a vehicle is in the street, repossession agents can take it.  (N. Johnson Dep. at 27.)  In these circumstances, the Court concludes that the officers were appropriately neutral in attempting to keep the peace, and that their conduct did not rise to the level of state action.  Without state action, there can be no violation of the Fourteenth Amendment.  *Moore*, 404 F.3d at 1046.  In the absence of any constitutional violation, the officers are entitled to qualified immunity.

### B.   Clearly Established

Even assuming that the repossession was accomplished under color of state law, the officers are nonetheless entitled to qualified immunity if their actions did not violate "clearly established statutory or constitutional rights of which a reasonable [officer] would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "This is not to say that an official action is protected by qualified immunity unless the very action in

question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotation marks and citation omitted).  The Johnsons have not cited caselaw in which a vehicle repossession accomplished on a public street was deemed violative of Minnesota law.  As discussed above, the officers' threats to arrest Mr. Johnson occurred after the repossession was complete and were appropriate responses to his behavior.  As in *Moore*,

> [t]he officers were required to make a close decision in the midst of a repossession fracas and could not have determined they were becoming so entangled in [the creditors'] private self-help remedy that they could be held liable . . . .  The officers . . . needed to diffuse the volatile situation, which necessarily resulted in one of the parties possessing the property when the public peace was restored.

404 F.3d at 1046 (citations omitted).  No reasonable officer standing in the shoes of Nelson, Townley, or Hietala could have believed their conduct was unlawful in light of clearly established law.

## III.    CLAIMS AGAINST NUTZHORN

The Johnsons' complaint names Jeremiah Nutzhorn, a Hibbing police officer. However, the Johnsons have failed to allege sufficient facts, let alone produce evidence, to support any claim against Nutzhorn arising out of the repossession incident.  Nutzhorn stated by affidavit that he was going to respond to the scene but turned around when Nelson informed him that other officers had already arrived.  (Aff. of Jeremiah Nutzhorn ¶ 2, Jan. 18, 2010, Docket No. 23.)  Nutzhorn asserts that he had no contact with the Johnsons on January 18, 2010.  (*Id.* ¶ 3.)  The Johnsons have not proffered any evidence

to the contrary, nor objected in any way to the Hibbing defendants' request to dismiss Nutzhorn from this case.   Any claims against Nutzhorn are therefore waived.   *See Graham v. Rosemount, Inc.*, 40 F. Supp. 2d 1093, 1101 (D. Minn. 1999).   Accordingly, the Court grants summary judgment to the Hibbing defendants as to Nutzhorn.

## IV.   *MONELL* CLAIM AGAINST THE CITY

A municipality may be held liable for the actions of its agents if its custom or policy caused or was the moving force behind a deprivation of a federal right.   *Avalos v. City of Glenwood*, 382 F.3d 792, 802 (8th Cir. 2004); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978).   Since the Court concludes the officers did not violate the Johnsons' rights, the *Monell* claim fails as well.   *See Hayek v. City of St. Paul*, 488 F.3d 1049, 1055 (8th Cir. 2007).   Moreover, the record contains no evidence of an unconstitutional custom or policy.   The Johnsons argue that the officers' decision not to direct both parties to seek a judicial determination reflects inadequate training, but "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."   *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985).   When the claim is regarding inadequate training, a plaintiff must establish that such training failures "reflect[] "a 'deliberate' or 'conscious' choice by a municipality . . . ."   *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989).   The Johnsons have cited no such evidence. Accordingly, the Court grants summary judgment to the City.

## V.    ADDITIONAL CLAIMS

In their complaint, the Johnsons appear to allege claims for theft and conversion against the Hibbing defendants.  (Compl. ¶¶ 101-113, Docket No. 1.)  Under state law, however, a police officer is protected by official immunity in the performance of his duties unless "he fails to perform a ministerial act, or when his performance of a discretionary act is willful or malicious."  *Thompson v. City of Minneapolis*, 707 N.W.2d 669, 673 (Minn. 2006).  A discretionary act is one necessitating "the exercise of individual judgment in carrying out the official's duties."  *Kari v. City of Maplewood*, 582 N.W.2d 921, 923 (Minn. 1998).  "A ministerial act, in contrast, is absolute, certain, and imperative, involving merely the execution of a specific duty arising from fixed and designated facts."  *Thompson*, 707 N.W.2d at 673 (quotation marks omitted).

The Court readily concludes that the officers involved in this incident acted with discretion.  *See Kelly v. City of Minneapolis*, 598 N.W.2d 657, 665 (Minn. 1999) ("[T]he conduct of police officers in responding to a dispatch or making an arrest involves precisely the type of discretionary decisions, often split-second and on meager information, that we intended to protect from judicial second-guessing through the doctrine of official immunity.").  The Johnsons have cited no evidence to suggest that the officers' actions were willful or malicious; they have not responded to the Hibbing defendants' arguments regarding their state law claims at all.  The Court concludes that the officers are entitled to official immunity from the Johnsons' state law claims.#

The City is likewise protected by vicarious official immunity. "In general, when a public official is found to be immune from suit on a particular issue, his government employer will enjoy vicarious official immunity from a suit arising from the employee's conduct." *Schroeder v. St. Louis Cnty.*, 708 N.W.2d 497, 508 (Minn. 2006); *see also Wiederholt v. City of Minneapolis*, 581 N.W.2d 312, 316 (Minn. 1998) (where employee is entitled to official immunity, municipality obtains vicarious official immunity if "failure to grant it would focus stifling attention on the official's performance to the serious detriment of that performance" (internal quotation marks omitted)). The Johnsons have suggested no reason why the state law claims against all Hibbing defendants should not be dismissed, and the Court finds none.

This case will be placed on the Court's next available trial calendar.

## ORDER

Based on the foregoing, and the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that the Hibbing defendants' Motion for Summary Judgment [Docket No. 21] is **GRANTED**.


DATED: August 17, 2011                    _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                              JOHN R. TUNHEIM
                                           United States District Judge